**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LOURDES C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19-cv-04543** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Lourdes C. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIBs") under 42 U.S.C. §§416(i) and 423(d) of the Social Security Act. The Commissioner has brought a cross-motion for summary judgment seeking to uphold its decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's request for summary judgment (Dckt. #8) is granted and the Commissioner's motion for summary judgment (Dckt. ##17, 18) is denied.

---

[1] In accordance with Internal Operating Procedure 22 – "Privacy in Social Security Opinions," the Court refers to Claimant only by her first name and the first initial of her last name. Furthermore, Kilolo Kijakazi is now the Commissioner of Social Security and is substituted in this matter pursuant to Fed. R. Civ. P. 25(d). No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

## I.    BACKGROUND

### A.    Procedural History

On January 23, 2014, Claimant (then forty-four years old) filed an application for DIBs, alleging disability dating back to October 2010, due to stroke, depression, bipolar disorder, diabetes, memory loss, inability to focus, nervousness, inability to retain information, weakness of the right side, and inability to multitask.  (R. 230).  Her claim was denied initially and upon reconsideration.  (R. 101).  Claimant filed a timely request for a hearing, which was held on September 2, 2016, before an Administrative Law Judge ("ALJ").  (R. 846-901).  On November 4, 2016, the ALJ issued a written decision denying Claimant's application for benefits.  (R. 98).  The Appeals Council denied review on September 18, 2017, and Claimant appealed to the U.S. District Court for the Northern District of Illinois.  (R. 988-93).  The Commissioner declined to defend the ALJ's decision and agreed to a voluntary remand, which the District Court ordered.  The Appeals Council vacated the decision of the Commissioner and remanded the case to the original ALJ for further proceedings.  (R. 1011).

A second hearing was held on January 29, 2019.  (R. 905).  The ALJ issued a written decision on April 23, 2019, again denying Claimant's application for benefits.  (R. 902-27).  Claimant subsequently filed her complaint for administrative review in the District Court on July 3, 2019.

### B.    The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that she is disabled, meaning she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

2

U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). Then, at step two, it determines whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered disabled, and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, an individual is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

**C.  The Evidence Presented to the ALJ**

Claimant suffered a stroke in October 2010. (R. 618). Claimant seeks DIBs for symptoms and limitations stemming from the stroke, including depression, bipolar disorder

3

(which may or may not have predated the stroke), memory loss, inability to focus, nervousness, inability to retain information, weakness of the right side, and inability to multitask.[2]  (R. 230). The administrative record contains the following evidence that bears on Claimant's claim:

### 1.    Evidence from Claimant's Treating Physicians

On October 14, 2010, Donald Lussky, M.D., found that Claimant had experienced a "right middle cerebral artery stroke."  (R. 647).  More than one year later, on March 1, 2012, he noted Claimant's continued reports of depression, problems with attention and concentration, and memory loss.  (R. 620).  On June 23, 2011, Claimant still had "some residual word finding difficulty" and struggled with short-term memory loss.  (R. 313).  In October 2013, Dr. Lussky strongly recommended that Claimant seek psychiatric help due to her lasting depression and memory problems.  (R. 618).

On August 23, 2012, Eric B. Larson, a clinical psychologist, conducted a neuropsychological evaluation of Claimant.  (R. 689).  Dr. Larson described Claimant as "friendly and cooperative" during her interview, but "frustrated and much more tearful" during testing.  *Id.*  Claimant eventually became so upset that she refused to complete the memory portion of the evaluation.  As such, Dr. Larson noted that it was "unclear whether she [was] experiencing memory deficits."  (R. 691).  Based on the limited memory testing he was able to perform, Dr. Larson concluded that Claimant's short-term memory "was not grossly impaired." (R. 690).  Dr. Larson's assessments of Claimant's executive functioning yielded results below expectations.  (*Id.*).

Timothy M. Cullinane, M.D., saw Claimant approximately every three months beginning in 2013.  In his medical notes, he routinely recorded Claimant's subjective complaints of

---

[2] Claimant has also been diagnosed with diabetes, but this is not relevant to her appeal.

memory loss and unstable moods. On December 31, 2013, Dr. Cullinane filled out a form on Claimant's mental ability to do work-related activities. He found that Claimant was unable to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule; (5) maintain regular attendance; be punctual; (6) perform at a consistent pace; (7) travel in unfamiliar places; (8) use public transportation; (9) set realistic goals; or (10) make plans independently of others. (R. 700). He based these findings on Claimant's reports of poor memory and concentration since the stroke. (*Id.*).

On March 28, 2014, Dr. Cullinane completed a second Social Security Disability Form, opining that Claimant could only concentrate for very short periods of time and would have "trouble starting and initiating tasks without step-by-step direction, which she would have trouble remembering as well." (R. 707). Although he did not test her orientation, memory or judgment, Dr. Cullinane noted that he "would think she would have significant difficulties with memory" given her reports of forgetfulness and "other cognitive functionings." (*Id.*). Finally, on June 30, 2015, Dr. Cullinane wrote that Claimant would be unable to live independently without her brother and demonstrated "very poor judgment." (R. 786-87).

On November 14, 2012, a speech language pathologist from the Rehabilitation Institute of Chicago examined Claimant to determine whether she would be a good fit for rehabilitative services. The examiner noted that Claimant demonstrated "decreased sustained attention, information processing, memory-encoding deficits, decreased executive functions." (R. 662). She found that Claimant's rehabilitation potential was "good" and that Claimant was "an excellent candidate" for speech language pathology. (R. 663).

5

On November 12, 2013, Richard L. Harvey, an M.D. specializing in physical medicine and rehabilitation, completed a "Statement of Ability to do Work-Related Activities (Mental)" form regarding Claimant. (R. 650). He found that Claimant had a "poor ability" to remember locations and work-like procedures; understand, remember, and carry out short, simple instructions; understand, remember, and carry out detailed instructions; complete a normal workday or workweek; and perform at a consistent pace. (R. 649). He also noted that Claimant would be unable to travel in unfamiliar places; use public transportation; set realistic goals; and make plans independently of others. (R. 650). He indicated that "neuropsychological testing and performance in therapy" supported these findings. (R. 649). When asked whether Claimant's impairment affected her ability to appropriately respond to supervision, co-workers, and work pressures in a work setting, Dr. Harvey wrote that he "cannot comment" and recommended the SSA contact a psychiatrist. (R. 650). It is unclear from the record how many times or in what capacity Dr. Harvey saw Claimant, although he is listed as the attending physician on most of her records from the Rehabilitation Institute of Chicago, which were provided from August 23, 2012, through December 6, 2013.

On April 13, 2015, Claimant presented to the emergency room with paranoid ideations and auditory hallucinations and required "acute inpatient psychiatric hospitalization." (R. 790). When first admitted, Claimant "needed constant reality orientation [and] redirection." (R. 791). She was placed on Trazodone and Risperdal. (R. 790). In a consult report dated April 14, 2015, Shyam Mohan Puppala, M.D., noted the Claimant was poorly groomed and experiencing depression, anxiety, paranoid ideations, mood swings, racing thoughts, flights of ideas, poor concentration, and poor judgment. (R. 794). Claimant thought someone was trying to poison her and was unable to concentrate or sleep. (*Id.*). Dr. Puppala also noted that Claimant's

memory was intact for short and long-term events, that she had no cognitive symptoms, and that she had above average intellectual capacity.  At the time of her discharge on April 21, 2015, she was "once again reminded of the importance of medication compliance."  (R. 791).

Dr. Puppala also documented Claimant's score on the Global Assessment of Functioning ("GAF") scale, which "is a 100-point metric used to rate overall psychological, social, and occupational functioning, with lower scores corresponding to lower functioning."  *Williams v. Berryhill*, 707 Fed.Appx. 402, 404 (7th Cir. 2017).  Claimant's GAF score was 25 upon admission and 50 at the time of discharge.  (R. 790).

## 2.    Evidence from Examining Sources

 On February 6, 2015, Norton B. Knopf, Ph.D., examined Claimant and completed a Psychological Report.  He noted that Claimant remembered her dinner from the night before, her address, and the approximate route she and her brother had taken to the evaluation site.  (R. 780). Dr. Knopf diagnosed Claimant with mild neurocognitive disorder due to traumatic brain injury. (R. 782).  He observed that, although Claimant was competent to manage her own affairs and funds, her judgment and ability to explain abstractions were poor.  (R. 780, 782).

On April 28, 2014, Michael E. Stone, Psy.D., examined Claimant for the purposes of her benefits claim.  He noted that Claimant "exhibited problems maintaining a consistent level of attention and concentration throughout evaluation" and "[s]imple calculations were somewhat difficult."  (R. 725-26).  Claimant was able to remember the route she took to the doctor's office, but she could not recall three objects after five minutes.  (R. 725).

On March 12, 2015, M.W. DiFonso, Psy.D., a state agency psychological consultant, completed a Mental RFC Assessment of Claimant.  (R. 92).  Dr. DiFonso concluded that, although Claimant had understanding and memory limitations, her ability to remember locations,

remember work-like procedures, and understand and remember very short and simple instructions was not significantly limited. (R. 93). Accordingly, Dr. DiFonso found that Claimant could complete and remember simple one and two-step tasks, but "may have more difficulty understanding or remembering more detailed instructions." (*Id.*). Dr. DiFonso also found that, despite Claimant's sustained concentration and persistence limitations, she could maintain the attention, concentration, and persistence necessary to carry out simple work tasks at a consistent pace over a regular workweek. (*Id.*).

### 3. Hearing Testimony

At the initial hearing in 2016, Claimant testified that she has a bachelor's degree in Business Administration from DePaul University. (R. 857). She testified that she worked as a partner at a real estate office prior to her stroke, but could no longer work as a real estate agent because her "memory is shot." (R. 876). As to her daily activities, Claimant could dress, bathe, and shop independently. (R. 862-63). She typically attended church five mornings per week, after which, she read and did housework. (R. 865). She cooked at least one meal each day and went to Zumba class most nights. (R. 866, 870). She had stopped taking bipolar medications due to the side effects. (R. 869). Claimant had her own checking and savings accounts from which she could independently make withdrawals. (R. 874). She estimated that she has trouble concentrating about 20% of the time. (R. 877).

At the 2019 hearing, Claimant reiterated much of her earlier testimony. (R. 939-67). Since the prior hearing, she had stopped driving due to a DUI. (R. 952). She had also stopped regularly exercising. (*Id.*). She clarified that she has engaged in very limited property management following her stroke and has to take detailed notes due to her memory loss. (R. 940). She occasionally takes multiple buses to check in on her brother's tenants. (R. 947).

When the ALJ asked Claimant whether she had the capacity to "go to a job, a simple job, like let's say in a factory where you're on a production line, and you're just doing something over, and over again eight hours a day," Claimant responded, "I could, I think, but I wouldn't want to." (R. 956).

Claimant's brother, Nolberto, testified at both hearings. At the 2016 hearing, he stated that Claimant makes him breakfast most mornings. (R. 882). He estimated that Claimant began driving again two months after her stroke. (R. 883). When asked how the stroke affected Claimant mentally, he said that "[b]efore she was able to do fifteen tasks at the same time and after the stroke, she couldn't really do one task at the same time." (R. 884). At both hearings, Nolberto noted that he pays Claimant's bills and often drives her to errands and appointments. (R. 888, 978). At the 2019 hearing, Nolberto explained that, since her stroke, Claimant no longer helps with the real estate business, but visits tenants about once a month via public buses. (R. 971-72). Claimant routinely forgets her phone, keys, shoes, jackets, and appointments. (R. 976). He estimated that Claimant is completely lucid between 25% and 30% of the day. (R. 977).

Pamela Nelligan, a vocational expert, also testified at the 2019 hearing. (R. 983). The ALJ asked Ms. Nelligan about a hypothetical individual with the Claimant's age and education who was limited to simple, routine, and repetitive tasks in a low stress job (meaning only occasional decision-making required) that required no hourly production quota, frequent proximity to the public and co-workers, no coordination with or joint tasks with co-workers, no interactions with the general public, only simple work-related decisions, and the ability to adapt to routine workplace changes. The vocational expert testified that such an individual would not be capable of performing Claimant's past work as a real estate sales agent or property manager. (R. 985). However, the individual would be able to perform work as a laundry worker, a cleaner,

9

or a transportation cleaner.  If that same hypothetical individual was off task for 15% or more of

the workday, she would be unable to obtain competitive employment.  (*Id.*).  A person who could

not perform activities within a schedule or be punctual would also be precluded from

employment, as would someone unable to complete a normal workday or workweek.  (R. 986).

### D.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching his decision to

deny Claimant's request for benefits.  At step one, the ALJ found that Claimant had not engaged

in substantial gainful activity during the period between her alleged onset date of October 1,

2010, and her date last insured of March 31, 2014.  (R. 908).  At step two, the ALJ determined

that, through the date last insured, Claimant suffered from the severe impairments of "status-post

right middle cerebral artery stroke; major depressive disorder; and bipolar disorder."  (*Id.*).  At

step three, the ALJ concluded that Claimant did not have an impairment or combination of

impairments that met or medically equaled one of the Commissioner's listed impairments,

including listing 11.04 for "vascular insult to the brain," 12.02 for "cognitive impairment," or

12.04 for "depressive disorder."  (R. 909).  The ALJ found that Claimant's impairments caused

mild limitations in understanding, remembering, or applying information; mild limitations in

interacting with others; moderate limitations in concentrating, persisting, or maintaining pace;

and mild limitations in adapting and managing oneself.  (R. 909-10).

Before turning to step four, the ALJ determined that, through the date last insured,

Claimant had the residual functional capacity ("RFC") to perform a full range of work at all

exertional levels with the following non-exertional limitations:

> The [C]laimant can do simple, routine, and repetitive tasks in a low-stress job,
> which I define as only occasional decision-making required.  She cannot perform
> work with an hourly production quota.  She can frequently be in proximity with the
> public and co-workers but cannot work in coordination with or on joint tasks with

co-workers. She should not have interactions with the general public. She can make simple, work-related decisions with the ability to adapt to routine workplace changes.

(R. 910). Based on these conclusions, the ALJ determined at step four that Claimant was not capable of performing past relevant work as a real estate sales agent or a property manager. (R. 918). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could have performed through the date last insured. (R. 919). As such, the ALJ found that Claimant was not under a disability from her alleged onset date through the date last insured. (*Id.*).

## III.     STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th

Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV. DISCUSSION

In support of remand, Claimant alleges, *inter alia*, that the ALJ failed to properly evaluate the medical opinions in the record. The Court agrees that the ALJ's reasons for giving little weight to Dr. Richard Harvey's opinion are inadequate to "build an accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). The ALJ's failure to evaluate the findings of Dr. Shyam Puppala further supports remand, as does the ALJ's evaluation of the testimony of Claimant's brother, Nolberto.[3]

---

[3] Claimant also argues that the ALJ erred in his evaluation of three opinions by treating physician Dr. Cullinane. However, the Court finds that the ALJ adequately explained his reasons for discounting these opinions by noting that they were inconsistent with the doctor's own medical records and based primarily on Claimant's subjective complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it."). In making this finding, the Court notes that the only medical or clinical findings Dr. Cullinane cited in support of his most negative assessments were the Claimant's own reports of poor memory and concentration. (R. 700-01); *Ray v. Saul*, 861 Fed.Appx. 102, 106 (7th Cir. 2021) (where ALJ failed to expressly consider each checklist factor, the court had "no doubt" any error was harmless where review of treating physician's notes showed "little more than [claimant's] reported symptoms of pain and lists of prescribed medications"). Comparatively, records based on the doctor's own observations were consistently positive, noting that Claimant had good control of her symptoms, (R. 731, 733), and good control of her mood, (R. 707, 732).

A.    **The ALJ's reason for discounting the opinion of treating physician Dr. Harvey was unsupported by the record.**

It is well-settled that a treating physician's opinion is entitled to controlling weight if it is supported "by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).[4]  "[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see also Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (finding an ALJ must "offer good reasons for discounting a treating physician's opinion").  The ALJ must then consider the factors listed in 20 C.F.R. §404.1527(c) to decide how much weight to give the opinion. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).  An inadequate evaluation of a treating physician's opinion requires remand. *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016); *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011).

Here, Dr. Harvey concluded that Claimant had "poor" ability (meaning no useful ability) to understand, remember, and carry out short, simple instructions; remember locations and work-like procedures; complete a normal workday or workweek; and perform at a consistent pace.  (R. 649).  He further opined that Claimant had only "fair" ability (could perform satisfactorily some of the time) to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; and make simple work-related decisions. *Id.*  When asked whether Claimant's ability to respond appropriately to

---

[4] For claims filed on or after March 27, 2017, the treating physician rule has been modified to eliminate the controlling weight instruction. *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018).

supervision, co-workers, and work pressures in a work setting was affected by her impairment,

Dr. Harvey wrote, "cannot comment, contact psychiatrist."  (R. 650).

Although this evaluation constitutes an opinion from one of Claimant's treating

physicians, the ALJ afforded it "little weight."  (R. 914).  His primary explanation for doing so

was that Dr. Harvey's findings were "not consistent with prior testing or subsequent evidence

that shows *normal* memory and executive functioning." [5]  (*Id.*) (emphasis added).

An ALJ's reasoning is flawed where it rests on a mischaracterization of the evidence.

*See, e.g., Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) (finding an ALJ's reasoning

inadequate where the ALJ said that "no evidence" showed claimant's pain would not respond to

surgery when, in reality, multiple doctors had classified the pain as incurable); *Lucy S. v. Saul*,

No. 18-CV-6869, 2020 WL 1275017, at *5 (N.D. Ill. Mar. 17, 2020) (remanding where the

physical examinations cited by the ALJ as inconsistent with treating physician's opinion were

not actually inconsistent with the opinion).  In this case, the Court finds the ALJ's analysis was

clearly unsound where no tests or evidence in the 1,248-page record indicate that Claimant had

"normal" memory or executive functioning at any time following her stroke.

To the contrary, each medical professional who examined, tested, or reviewed the records

of Claimant found that she demonstrated at least some limitations in memory and functioning.

First, between 2013 and 2015, Dr. Cullinane, Claimant's treating physician, repeatedly opined

that Claimant reported poor memory and poor ability to function.  (R. 700) (noting patient

"reports poor memory"); (R. 701) ("concentration and memory, mainly the ability to make new

memories, is affected); (R. 704) (noting serious limitations in functional ability and work-related

---

[5] Executive functioning is "higher-level cognitive processes; for example, regulating attention, planning,
inhibiting responses, [and] decision-making."  Med. Proof of Soc. Sec. Disab. 2d § 12:4 (2018 ed.).

functioning); (R. 706) (noting that stroke caused an "inability to remember things easily, and significant forgetfulness, as well as severe mood liability" and inability to concentrate for significant periods of time); (R. 786-87) (opining that Claimant would not be able to live independently without brother and demonstrated "very poor judgment").

On August 23, 2012, Dr. Larson conducted a six-hour neuropsychological evaluation of Claimant. His formal assessments of her executive functioning yielded results in the "low-average" range, which were below expectations. (R. 690). Dr. Larson predicted these limitations in functioning would manifest in an inability to organize work in the future. *Id.* While it is true that Dr. Larson also found that Claimant's short-term memory was "not grossly impaired" based on his observations and limited testing, he cautioned that it was "unclear whether she is experiencing memory deficits" because Claimant terminated the evaluation before memory testing had been completed. (R. 691). In light of this clarification and the incomplete nature of the testing, Dr. Larson's report does not support the ALJ's statement that testing showed "normal memory."

Even Dr. Knopf, who found that Claimant was capable of managing her own affairs and funds, observed that Claimant's judgment and ability to explain abstractions were poor and diagnosed her with mild neurocognitive disorder due to traumatic brain injury. (R. 780-83). Although Dr. Knopf did note that Claimant was able to remember certain things, he made no explicit findings regarding Claimant's memory capabilities. (R. 780-81). Only one treating physician, Dr. Puppala, noted that Claimant's "memory was intact for short and long-term events," as evidenced by her ability to recount her own social history and her ability to remember three words. (R. 794). However, this finding was not cited by the ALJ and, in the same report, Dr. Puppala also assessed that Claimant had GAF scores (25 at the lowest and 50 at the highest)

15

which "signif[y] serious psychiatric illness" and suggest functional difficulties. *Voight v. Colvin*, 781 Fed.Appx. 871, 874 (7th Cir. 2015).[6]

Claimant's other evaluators also noted memory and executive function-related limitations. (R. 662) (speech pathologist concluded that Claimant's immediate memory skills and encoding capabilities were impaired, noting "decreased sustained attention, information processing, memory-encoding deficits, [and] decreased executive functions"); (R. 725-26) (examining psychologist Dr. Stone noted that Claimant "exhibited problems maintaining a consistent level of attention and concentration throughout evaluation," had some difficulty with simple calculations, was unable to grasp the meaning of proverbs – indicating a problem with abstract thinking – and was unable to remember three objects after five minutes)[7]; (R. 93) (state agency consultant Dr. DiFonso found that Claimant "has understanding and memory limitations," as well as sustained concentration and persistence limitations).

Again, when considering whether an ALJ properly evaluated a treating physician's opinion, the relevant inquiry is whether the ALJ "sufficiently accounted for the factors in 20 C.F.R. §404.1527 and built an 'accurate and logical bridge' between the evidence and his conclusion." *Chris W. v. Berryhill*, No. 17 CV 6532, 2018 WL 6305013, at *8 (N.D.Ill. Dec. 3, 2018). In this case, the Court finds he did not. The fact that the ALJ only explicitly addressed

---

[6] A GAF score of 25 indicates that a person's behavior "is considerably influenced by delusions or hallucinations or serious impairment in communication or judgement . . . or inability to function in almost all areas." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000). A GAF score of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[7] "Executive functions are those aspects of cognitive ability allowing us to plan, organize, shift, and reason through our behaviors. Abstract reasoning, or the application of abstract thought through our behaviors, is a vital component of these important skills." Jennifer Niskala Apps, Encyclopedia of Aging and Public Health (2008 ed.), *Abstract Thinking* (2006).

two of the regulatory factors in his assessment is troubling in and of itself.[8] *Ray v. Saul*, 861
Fed.Appx. 102, 105 (7th Cir. 2021) ("While we will not vacate or reverse an ALJ's decision
based solely on a failure to expressly list every checklist factor, we do expect the ALJ to analyze
the treating source's medical opinion 'within the multifactor framework delineated' in the
regulation.") (internal citation omitted). The fact that he mischaracterized the evidence while
doing so requires reversal. *See, e.g., Beardsely*, 758 F.3d at 837 (noting that reversal and remand
may be required where the ALJ based his decision on serious factual mistakes or omissions).
Because the vocational expert testified that someone with the limitations described in Dr.
Harvey's opinion would be precluded from obtaining competitive employment, (R. 983), the
Court cannot find the ALJ's improper evaluation of that opinion to be harmless.

> **B.** **The ALJ erred by failing to assign weight to the findings of treating physician Dr. Puppala.**

Claimant further argues that the ALJ entirely failed to evaluate the opinion of Dr.
Puppala, who treated Claimant during her nine-day psychiatric hospitalization in 2015. (Dckt.
#8 at 10). According to Claimant, Dr. Puppala's observations – specifically, her evaluation of

---

[8] The only other regulatory factor explicitly addressed by the ALJ was whether Dr. Harvey was a
specialist in an area relevant to his findings. Regarding this factor, the ALJ noted that Dr. Harvey's
specialty in physical medicine and rehabilitation – also known as physiatry – was "not particularly
germane to giving opinions on neurocognitive disorders/impairments." (R. 914-15). Although this issue
is not dispositive given the above-described problem with the ALJ's analysis, the Court notes that
physiatry is a wide-ranging field of medicine focusing on patients who "have had injuries or suffer from
disabilities that affect physical and cognitive functioning." Penn Medicine, *Physical Medicine and
Rehabilitation FAQs*, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-
service/physical-medicine-and-rehabilitation (last visited Jan. 18, 2022). While it does seem that the
specialty is primarily focused on evaluating and treating patients' physical symptoms and capabilities, Dr.
Harvey himself was likely better-suited than the ALJ to determine which opinions he was unqualified to
render given his specialty. He accordingly refrained from answering certain prompts in the evaluation,
writing that the Social Security Administration should "contact a psychiatrist" for questions regarding
Claimant's emotional responses to certain external factors. (R. 649-50). On remand, the ALJ should
consider the holistic nature of this field when determining what weight to assign Dr. Harvey's opinions.

Claimant's scores on the GAF scale – constitute medical opinions and, as such, had to be explicitly assessed by the ALJ.

The Commissioner asserts that because Claimant's hospitalization occurred after her date last insured, the records from it "cast even less light on her functioning during the relevant period." (Dckt. #18 at 11). However, medical records post-dating a Claimant's date last insured are often relevant, so long as they "shed light on her impairments and disabilities from the relevant insured period." *Milton v. Astrue*, 260 Fed.Appx. 918, 922 (7th Cir. 2008); *see also Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of claimant's condition during that period."). Moreover, as the Commissioner acknowledges, the ALJ discussed evidence from Claimant's hospitalization and treated that evidence as relevant, while otherwise ignoring Dr. Puppala's findings (R. 914).

In particular, the ALJ noted that Claimant was psychiatrically hospitalized after presenting to the emergency room with a blunted affect and paranoid claims of having been poisoned. (R. 914). The ALJ discounted the significance of the visit by noting that Claimant "admitted that she had stopped taking her psychiatric medications, apparently on her own initiative." (*Id.*). He also observed that Claimant began a new medication regimen during her hospitalization and was in an "improved" condition at the time of her discharge. (*Id.*). The ALJ did not, however, mention Claimant's GAF scores, assigned by Dr. Puppala, or discuss their significance.

The Commissioner asserts that GAF scores are not entitled to substantial weight and the ALJ's failure to mention them is unproblematic. Although it is true that the GAF has been criticized for subjectivity and is no longer widely used by psychiatrists and psychologists, *Price*

*v. Colvin*, 794 F.3d 836, 839 (7th Cir. 2015), the SSA "still considers these scores as relevant, medical-opinion evidence" and instructs ALJs to treat them accordingly, *Knapp v. Berryhill*, 741 Fed.Appx. 324, 329 (7th Cir. 2018); *see also Gerstner v. Berryhill*, 879 F.3d 257, 263 n.1 (7th Cir. 2018); *Laura V. v. Kijakazi,* 19-CV-3379, 2021 WL 6134697, at *2 (N.D.Ill. Dec. 29, 2021); *Elizabeth A.D. v. Saul*, No. 19 C 6024, 2021 WL 148831, at *11 (N.D.Ill. Jan. 14, 2021).[9]  The SSA's own training manual specifically stipulates that "[f]or claims with a filing date before March 27, 2017, we categorize a GAF rating as a 'medical opinion' if it was made by an acceptable medical source."  Soc. Sec. Admin., *Supplemental ALJ Training Notebook*, p. 35 (2017).

The ALJ's failure to assess and give weight to the GAF scores was especially significant in this case because, at the time of Claimant's discharge, her score was only 50.  (R. 790).  This score indicates "serious psychiatric illness."  *Voight*, 781 Fed.Appx. at 874.  Moreover, while this score was an improvement from Claimant's score at the time of her admission – which, at 25, signaled that Claimant was "considerably influenced by delusions or hallucinations or serious impairment in communication or judgement . . . or inability to function in almost all areas" (*supra,* at note 6) – the ALJ's notation that Claimant had "improved" by the time of her discharge means little without an assessment of the condition that she had improved *to*.  *See*

---

[9] While the cases cited by the Commissioner touch on the limitations of the GAF scale, they do not explicitly hold that an ALJ need not consider the scores when they appear in a medical record.  *See Sambrooks v. Colvin*, 566 Fed.Appx. 506, 511 (7th Cir. 2014) (noting that the ALJ should have contextualized claimant's GAF score of 60 by considering it alongside his other GAF scores of 45 and 50); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (observing that "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score" and holding that the ALJ did not err by refusing to consider the claimant's unexplained GAF score of 60 and instead relying on her psychologist's narrative finding that she "had no significant mental impairments") (internal quotation marks omitted).  Furthermore, these decisions were issued before *Gerstner*, which reiterated the SSA's requirement that ALJs "treat GAF scores as medical-opinion evidence."  *Gerstner*, 879 F.3d at 263 n.1.

*Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("one's medical condition could improve drastically, but still be incapable of performing . . . work."); *Martz v. Comm'r, Soc. Sec. Admin.*, 649 Fed.Appx. 948, 960 (11th Cir. 2016) ("improvement is a relative concept and, by itself, does not convey whether or not a patient has recovered sufficiently to no longer be deemed unable to perform particular work on a sustained basis."). In sum: even after eight days of hospitalization, extensive therapy, and a new medication regimen, Claimant's GAF score on discharge suggests that she was having serious limitations in functioning.

By failing to mention and weigh the significance of the GAF scores that Dr. Puppala assigned to Claimant, the ALJ failed to confront evidence that cut against his finding that Claimant is not disabled. This is an error that requires remand. As the Seventh Circuit has made clear, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton*, 596 F.3d at 425; *Moore v. Colvin,* 743 F.3d 1118, 1123 (7th Cir. 2014) ("We have repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only evidence supporting h[is] ultimate conclusion while ignoring the evidence that undermines it."); *see also Williams*, 707 Fed.Appx. at 407 (finding that VA mental health professionals were "treating sources" and noting that the ALJ likely erred by "inexplicably sa[ying] nothing at all about [claimant's] mental-health conditions, much less the GAF scores assigned to him by professionals at the VA Medical Center.").

C.        **The ALJ failed to adequately evaluate the testimony of Claimant's brother.**

The ALJ "generally credit[ed]" the testimony of Claimant's brother, Nolberto, and stated

that the RFC he formulated for Claimant was consistent with her brother's testimony.  (R. 917).

The ALJ discussed the brother's testimony as follows:

> He testified that the claimant was able to start driving again within two months after
> her stroke, that she did not have to use a cane or walker after the stroke, and that she
> had a   reduced capacity mentally to perform tasks after the stroke.  He also testified
> to the claimant's daily routine:  the claimant goes to church every morning Monday
> through Friday; upon returning home, he and the claimant will eat breakfast
> together; the claimant will then drive to the gym to work out; afterwards, she will
> return home to make herself lunch; then, she will perform housework and
> gardening; after dinner, she will do two hours in a Zumba class.  He testified that
> he does not keep track of whether claimant is taking her medication. [He] further
> testified that the claimant could not multi-task and would need reminders for her
> appointments.

(*Id.*).

The ALJ, however, ignored additional testimony from Claimant's brother that is

inconsistent with the RFC and suggests that Claimant is disabled.  In particular, Nolberto

testified that:  Claimant is only completely lucid between 25% and 30% of the day, (R. 977);

"the executive suite in her brain just shut off" after her stroke, (R. 890); she has trouble

remembering what day it is, (R. 890); and she routinely forgets her keys, cell phone, shoes,

jackets, and appointments, (R. 976).  If credited, this testimony certainly suggests that Claimant

would be off-task for 15% or more of the workday, be unable to perform activities within a

schedule, and have difficulty with being punctual – traits that, according to the VE, would

preclude competitive employment.  (R. 985-86).  The ALJ erred by focusing on the mainly

positive aspects of Claimant's brother's testimony while ignoring the portions of his testimony

that would support a finding of disability.  *See, e.g., Moore*, 743 F.3d at 1123 (criticizing the ALJ

for relying on evidence from claimant's parents regarding her potential addition to narcotic pain

medicine while ignoring other testimony from the parents that would support a contrary conclusion). On remand, the ALJ must confront those portions of Claimant's brother's testimony "that do[] not support h[is] conclusion and explain why that evidence was rejected." *Id.*

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dckt. #8) is granted and the Commissioner's motion for summary judgment (Dckt. #18) is denied. The Commissioner's decision is reversed, and this matter is remanded to the Social Security Administration for further proceedings consistent with this order.

**ENTERED:** February 25, 2022

**Jeffrey I. Cummings**
**United States Magistrate Judge**